UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DONALD MACHAN, an individual,
and as next friend of T.R., his daughter,

        Plaintiff,

                                       CASE NO. 1:17-cv-450

v.

                                       HON. ROBERT J. JONKER

SHAWN OLNEY, *et. al.*,

        Defendants.

_____/

## CORRECTED ORDER

This matter is before the Court on one of two defense motions for summary judgment (ECF Nos. 91, 95). The Court heard oral argument on the motions on April 25, 2018. The Court dismissed Plaintiff's state law claims without prejudice under 28 U.S.C. § 1367(c); dismissed Plaintiff's constitutional claims based on (1) the initial decision to take T.R. into protective custody and (2) alleged excessive force during the blood draw; and took the motion under advisement in all other respects. Supplemental briefing is complete. This is the decision of the Court.

### BACKGROUND[1]

On October 25, 2016, seventh-grader T.R. went to her school's administrative office to speak with Ms. McFadyen, a counselor with whom T. R. has met in the past. (T.R. dep., ECF No. 106-21, PageID.1060). Ms. McFadyen was not in the office. T.R. talked with the school principal, Ms. Gill-Williams, instead. (*Id.*, PageID.1063.) T.R. states that she told Ms. Gill-Williams "that

---

[1] The parties present the same basic chronology of events underlying this lawsuit, but they present markedly different accounts of what T.R. communicated to her school principal and the defendants. For the sole purpose of considering the motion for summary judgment, the Court accepts Plaintiff's version of the facts and draws all reasonable factual inferences in favor of Plaintiff as the non-moving party. The Court is making no findings of fact.

I was thinking about other kids killing themselves and that kind of stuff" but "never said that I was going to hurt myself." (T.R. dep., ECF No. 106-21, PageID.1063.)[2] Ms. Gill-Williams asked T.R. whether anything at home might have made her sad or upset, and T.R. responded that everything at home was fine. (*Id.*)

Ms. Gill-Williams initially tried to contact Ms. McFadyen by phone but was unable to reach her. (*Id.*)[3] Ms, Gill-Williams then called the school's Student Resource Officer,[4] Shawn Olney, who said she would come as soon as possible. At Officer Olney's request, her colleague Officer Wildey came and talked with T.R. until Officer Olney arrived a few minutes later. Upon her arrival, Officer Olney conversed with Ms. Gill-Williams, Officer Wildey, and T.R. to find out what was happening. (Olney dep., ECF No. 96-2, PageID.742.) T.R. states that she talked with the officers about how school was going, her classes, a friend, a movie about cyber-bullying, and her general concern that cyber-bullying made some kids commit suicide. (T.R. dep., ECF No. 106-21, PageID.1064.)[5]

According to T.R., she had no thoughts of committing suicide herself on October 25, 2016 and told no one that she was having such thoughts. (T.R. dep., ECF No. 106-21, PageID.1062.) However, after speaking with T.R., Ms. Gill-Williams, and Officer Wildey, Officer Olney decided

---

[2]According to Ms. Gill-Williams, T.R. told her that she could not stop thinking about suicide and had been having suicidal thoughts for about a month. (ECF No. 92-1, PageID.545)

[3] Ms. Gill-Williams states that T.R. asked whether she intended to call her father, Mr. Machan, and that T.R. said that her father would be angry if he had to leave work early. (*Id.*)

[4] The Student Resource Officer is a police officer assigned to the school. (ECF No. 96-2, PageID.740.)

[5] According to Officer Olney, T.R. told her that she had suicidal thoughts that would not go away; thought constantly about her dad's gun, sharp knives in the kitchen, and an axe in the basement; and that she did not feel safe going home because she was fearful of what she might do. (*Id.*) T.R. told her that she does not cut herself, but showed her ink blots on her hand where she stabbed herself with a pen. (*Id.*) Officer Olney says that T.R. told her she was afraid of how her dad might react if he learned of her suicidal thoughts. (*Id.*) T.R. denies telling Officer Olney and Wildey that she was having thoughts about hurting herself, that she had had such thoughts for the past month, and that she was afraid to tell them that she had suicidal thoughts because she thought her dad would get mad. (T.R. dep., ECF No. 106-21, PageID.1063.) For the purpose of deciding the motion for summary judgment, the Court accepts T.R.'s account as true.

to contact Mr. Machan and take T.R. to the hospital (Defendant South Haven Health System) for a mental health evaluation.  (Olney dep., ECF No. 96-2, PageID.742.)  Officer Olney called Mr. Machan, who was at work about 90 minutes away, and told him what was happening.  (*Id.*)  Mr. Machan recalls that Officer Olney "told me my daughter was being suicidal and she's going to take her to the hospital."  (Machan dep., ECF No. 106-15, PageID.967.)  Mr. Machan did not believe that T.R. was suicidal or needed to go to the hospital, and he instructed Officer Olney not to take T.R. to the hospital.  (*Id.*)  Officer Olney disregarded Mr. Machan's instruction.  (*Id.*)  Mr. Machan states that Officer Olney "just said I didn't really have a choice, she's taking her no matter what."  (*Id.*)  She took T.R. to the hospital "without my permission, without my consent," even though Mr. Machan "told her to stay there [at school], leave my daughter there."  (*Id.*, PageID.976.)

T.R. recalls that Officer Olney told her she would have to come with her to the hospital. (T.R. dep., ECF No. 106-21, PageID.1064.)  T.R. says that before departing for the hospital, Officer Olney called Mr. Machan from another room but that she could not hear their conversation. (*Id.*)  Officer Olney did not tell T.R. why she was taking her to the hospital.  (*Id.*, PageID.1064-65.)  Officer Olney took T.R. to the hospital in the police car.  (*Id.*)  T.R. rode in the back seat, crying.  (*Id.*, PageID.1078, 1081.)  They went to the E.R.  (*Id.*, PageID.1067.)  Officer Olney told T.R. that her father was on his way.  (*Id.*, PageID.1068.)

T.R. states that after she arrived at the E.R., Officer Olney told her to put on a hospital gown.  (*Id.*, PageID.1069.)  Defendant Jennifer Parker, an E.R. nurse, spoke with Officer Olney. (Parker dep., ECF No. 92-1, PageID.540.)  Nurse Parker understood that T.R. was in Officer Olney's protective custody.  (*Id.*)  Officer Olney told Nurse Parker that she had spoken with T.R.'s father but did not mention that Mr. Machan had directed her not to seek medical treatment for T.R.

3

(*Id.*)  Nurse Parker believed that Officer Olney had authority to consent to medical treatment for

T.R.  (*Id.*)

Nurse Parker conducted a mental health assessment and concluded that T.R. needed

treatment.  (*Id.*)  Nurse Parker asked T.R. whether she had ingested any harmful substances, and

T.R. said that she had not.  (*Id.*)  Nurse Parker observed no signs of intoxication or disorientation.

(*Id.*)  She asked Dr. Friedman whether to order bloodwork, and he directed her to do so.  (Friedman

dep., ECF No. 106-11, PageID.932.)  According to Nurse Parker, it is a standard practice in the

local medical community to draw blood and perform laboratory tests when a patient needs mental

health treatment, and the local mental health center will not perform a mental health evaluation

without preliminary bloodwork.  (*Id.* at 541.)

T.R. states that about twenty minutes after she arrived in the E.R., she learned that staff

intended to draw her blood.  (*Id.*, PageID.1068-69.)  She resisted:

> Well, they told me that they were going to draw my blood because it was
> procedure, and I got off the bed or I told them I was going to wait for my dad to
> get there, and they told me to lay back down in the bed and relax and they would
> wait for my dad to get there.  Then the next thing I know here comes three nurses
> getting ready to hold me down to draw my blood.

(*Id.*, PageID.1069.)  She recalls that a male nurse (Defendant Orrico) drew her blood, while three

nurses held her down – "one at the end of the bed holding down my ankles and there was one on

either side holding down the other parts of my legs."  (*Id.*)  T.R. states that the male nurse held her

arm down while he drew blood, and Officer Olney held her other arm down.  (*Id.*, PageID.1085.)

Another male nurse came in after her blood was drawn and told her that they had drawn her blood

"because it was procedure."  (*Id.*)  Soon after that, Mr. Machan arrived.  (*Id.*)

While she was in the emergency department at the hospital, T.R. felt scared of

"everything."  (*Id.*, PageID.1074.)  She was frightened about "what else they were going to try to

do." (*Id.*)  When Mr. Machan arrived, T.R. was in tears.  (Machan dep., ECF No. 106-15, PageID.972.)  The hospital agreed to release T.R. on the condition that Mr. Machan take her to a mental health center for evaluation.  (*Id.*)  Mr. Machan and T.R. went to the mental health center, where they stayed about 45 minutes before going home.  (Machan dep., ECF No. 106-15, PageID.970.)

Mr. Machan contends that Defendant Olney violated T.R.'s rights under the Fourth and Fourteenth Amendments, and Mr. Machan's rights under the First, Fourth, and Fourteenth Amendments, by taking T.R. to the hospital and by withdrawing blood and testing it for alcohol, drugs, and pregnancy without his consent and directly contrary to his instructions that these things not occur.  (*Id.*)

**LEGAL STANDARDS**

Summary judgment is appropriate only if, "taking the evidence in the light most favorable to the non-moving party, 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" *LaQuinta Corp. v. Heartland Props, LLC*, 603 F.3d 327, 335 (6th Cir. 2010) (quoting FED. R. CIV. P. 56(a)).  The key question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Governmental actors are "shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "As the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475

5

U.S. 335, 341 (1986).  "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry.  The first asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a [federal] right[.]" *Tolan v. Cotton*, 134 S.Ct. 1861, 1865 (2014) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "The second prong of the qualified immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866.  "[T]he salient question . . . is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional."  *Id.* (internal quotation marks omitted) (alterations in original).  Summary judgment is not appropriate "if there is a factual dispute (i.e., a genuine issue of material fact) involving an issue on which the question of immunity turns, such that it cannot be determined before trial whether the defendant did acts that violate clearly established rights*." Poe v. Haydon*, 853 F.2d 418, 425-26 (6th Cir. 1988).

No one disputes that Officer Olney acted under color of law.  The question is whether she is entitled to qualified immunity.  The hospital defendants – South Haven Health System, Weston Orrico, and Jennifer Parker – contend that Plaintiff fails to establish that Defendants Orrico and Parker acted under color of law, and that even if Defendants Orrico and Parker were state actors, they are entitled to qualified immunity.

## DISCUSSION

### I.      Claims Against Defendant Olney

#### 1.      Seizure

The Fourth Amendment protects against unreasonable searches and seizures.  "The Fourth Amendment requires an official seizing and detaining a person for a psychiatric evaluation to have probable cause to believe that the person is dangerous to [her]self or others." *Monday v. Oullette*,

118 F.3d 1099, 1102 (6th Cir. 1997). "Just as actual innocence will not render an arrest invalid if it is based on then-existing probable cause that criminal activity is occurring . . . a mental health seizure can rest upon probable cause even when the person seized does not actually suffer from a dangerous mental condition." *Id.* "Because 'probable cause is a fluid concept, turning on the assessment of probabilities in particular factual contexts,' . . . courts must evaluate the existence of probable cause from the perspective of a reasonable and objective person in the position of the seizing official." *Id.* (quoting *Illinois v. Gates*, 462 U.S. 213, 245 n. 13 (1983)). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application….[I]ts proper application requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Liability under § 1983 exists only if the seizure is unreasonable. *Brokaw v. Mercer County*, 235 F.3d 1000, 1010 (7th Cir. 2000). "In the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances…." *Id.* at 1010; *see also O'Donnell v. Brown*, 335 F.Supp.2d 787, 801 ("Warrantless … seizures are per se unreasonable under the Fourth Amendment, except pursuant to [a] few specifically established and well-delineated exceptions, such as the exigent circumstances exception . . . ."). Exigent circumstances involve an imminent threat and "a need to protect or preserve life or avoid serious injury." *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 997 (6th Cir. 1994) (internal quotation marks and citation omitted). In the context of a mental health seizure, the probable cause and exigent circumstances concepts overlap. Both involve an imminent risk of harm to self or others.

Plaintiff is not challenging Officer Olney's initial decision to detain T.R. at school. The Court would find that initial detention proper in any event. Whether considered under Plaintiff's

version or Officer Olney's version of the facts, the initial detention decision comports with the

Fourth Amendment under *Monday*.  T.R. by her own account was distressed enough to seek the

school counselor, and it was reasonable for Officer Olney to stay with her at the school, rather than

allow T.R. to head home on her own.  Indeed, Mr. Machan himself suggested that Officer Olney

keep T.R. at school until he could come pick her up.  There was no constitutional impropriety in

the initial detention.

Officer Olney's next decision is different.  Instead of keeping T.R. at school, as Mr.

Machan requested, she took T.R. to the hospital for medical evaluation, against Mr. Machan's

explicit instruction.  T.R. did not want to go to the hospital and did not consent.  Mr. Machan did

not want T.R. to go to the hospital and expressly denied consent.  Nothing in the record suggests

that T.R. had ingested any harmful substance or otherwise endangered her physical well-being.

Nor does the record suggest that T.R. was in physical distress.  She did not appear confused,

intoxicated, or disoriented.  The parties dispute whether the circumstances amounted to the kind

of emergency that might justify Officer Olney's decision to take T.R. to the hospital.

On T.R.'s version – which controls here -- a factfinder could readily conclude that Officer

Olney's decision to take T.R. to the hospital instead of staying with her at the school until her

father could come was objectively unreasonable.  *See Bruce v. Guernsey*, 777 F.3d 872, 877 (7th

Cir. 2015) (finding plaintiff stated a plausible § 1983 claim against police officer who took minor

into custody and transported her to hospital for mental health evaluation over her and her father's

objections based solely on a report that she was possibly suicidal).   At the time Defendant Olney

decided to take T.R. to the hospital, she knew that T.R. herself did not want to go.  More

importantly, Defendant Olney knew that T.R.'s father – the custodial parent with responsibility for

T.R. – did not want T.R. to go to the hospital.  Defendant Olney decided to disregard the

instructions of T.R.'s father and substitute her own judgment based only on T.R.'s amorphous comments about cyber-bullying and teenage suicide generally.[6]

It is well-established that under the Fourth Amendment an officer may seize and detain an individual for mental health treatment only if there is probable cause to believe the individual presents a danger to herself or others. *Monday*, 118 F.3d at 1102; *Bruce*, 777 F.3d at 877. Crediting T.R.'s account, a trier of fact could reasonably find that Officer Olney took T.R. to the hospital even though T.R. had not expressed any thoughts of self-harm; showed no sign of having ingested any intoxicant or otherwise harmful substance; showed no sign of confusion or disorientation; mentioned no problems at home that might make her upset; and even though Mr. Machan told Officer Olney he did not believe T.R. was suicidal. A trier of fact could reasonably conclude that there were no exigent circumstances and that Officer Olney lacked probable cause to believe that T.R. presented a danger to herself or others. Whether there existed exigent circumstances or probable cause to take T.R. to the hospital for mental health treatment is a question for a trier of fact. T.R.'s Fourth Amendment claim against Defendant Olney cannot be resolved as a matter of law.

Accordingly, summary judgment based on qualified immunity for Officer Olney is inappropriate, and her motion is **DENIED**.[7]

---

[6] A decision to submit a person to the hospital for mental health evaluation and possible treatment is no casual thing. It has the potential for immediate traumatic impact, as T.R.'s own reactions in this case demonstrate. Moreover, the decision leaves a permanent record that may require T.R. to explain things on future questionnaires for jobs, insurance, and school admissions. Weighing these considerations is the responsibility of T.R. and her father, not a school police officer.

[7] Even considering Defendant Olney's version of what happened, the Court is inclined to believe that a reasonable jury could still conclude there was not an emergency significant enough for Defendant Olney to disregard the explicit instruction of T.R.'s father. Defendant Olney's version of events suggests that T.R. was more vocal about personal thoughts of suicide, and even that she had considered available tools to hurt herself at home. But this level of concern could reasonably be addressed simply by waiting with T.R. at school, and without overriding the instructions of T.R.'s father regarding medical decisions.

### 2.     Due Process

#### A.     Parent/Child Associational Interest

"Choices about marriage, family life, and the upbringing of children are among associational rights [the Supreme] Court has ranked as of basic importance in our society . . . rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect." *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (internal quotation omitted).  Indeed, '"the interest of parents in the care, custody, and control of their children – is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (O'Connor, J.) (discussing cases).  The Due Process Clause of the Fourteenth Amendment protects this fundamental right." *Id.*  The Supreme Court has held repeatedly that parents have a fundamental liberty interest in directing the upbringing of their children.  *See, e.g,. Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923).  The Sixth Circuit similarly recognizes this liberty interest.  *Doe v. Staples*, 706 F.2d 985, 988 (6th Cir. 1983) ("[I]t is axiomatic that a parent has a liberty interest in the freedom of personal choice in matters of family life in which the state cannot interfere.").  The "fundamental constitutional right to family integrity extends to all family members, both parents and children." *O'Donnell v. Brown*, 335 F.Supp.2d 787, 820 (W.D. Mich. 2004) (Quist, J.).

The state may burden the exercise of fundamental rights in limited circumstances, of course.  "Government actions that burden the exercise of those fundamental rights or liberty interests are subject to strict scrutiny, and will be upheld only when they are narrowly tailored to a compelling governmental interest." *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000).  Accordingly, the Court asks whether a compelling government interest underpins taking T.R. to the hospital for medical treatment against Mr. Machan's express instruction, and whether Officer

10

Olney's actions were narrowly tailored to achieve that interest.  Certainly the government has a compelling interest in preventing suicide.  But a trier of fact could reasonably find that Officer Olney could have achieved that interest by staying with T.R. until Mr. Machan could come to the school to pick her up, as Mr. Machan requested.  A fact-finder could conclude that Officer Olney's decision to take T.R. to the hospital instead was not a narrowly-tailored means of preventing suicide or attempted suicide.

### B.      Liberty Interest in Refusal of Treatment

Government-imposed medical treatment against T.R.'s wishes and Mr. Machan's instruction also impinges on protected liberty interests in the refusal of medical treatment.  *See Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 278 (1990) ("The principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment may be inferred from our prior decisions."); *Parham v. J.R.*, 442 U.S. 584, 600 (1979) ("[A] child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment."); *Washington v. Harper*, 494 U.S. 210, 221-222 (1990) (recognizing that prisoners possess "a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs under the Due Process Clause of the Fourteenth Amendment."); *see also id.* at 229 ("The forcible injection of medication into a nonconsenting person's body represents a substantial interference with that person's liberty."); *U.S. v. Green*, 532 F.3d 538, 545, 558 (6th Cir. 2009) (acknowledging long-standing precedent regarding an individual's constitutional right to refuse medical treatment and noting that "only an essential or overriding state interest can overcome that protected liberty interest.").

Whether factual circumstances existed that would justify Officer Olney's taking T.R. to the hospital and pursuing immediate medical care for T.R., including a blood draw, even after T.R.

said that she wanted to wait for her father, and even though Officer Olney knew Mr. Machan was on his way to the hospital, is a question for a trier of fact.  A reasonable trier of fact could determine that Officer Olney violated both T.R.'s right to refuse medical treatment and Mr. Machan's right to make medical decisions on her behalf, and Officer Olney's approach – interposing her own judgment in place of Mr. Machan's clear direction – was not narrowly tailored to achieve the interest of preventing suicide or attempted suicide.

## II.      Claims against Hospital Defendants

All agree that in October 2016, when Officer Olney took T.R. to the hospital for medical treatment, the hospital was a part of South Haven Medical System and operated under the Michigan Hospital Authority Act, MICH. COMP. L. § 331.1 *et seq.* Plaintiff states that two cities and seven townships owned South Haven Health System at the time and that therefore South Haven Health System was a state actor.[8]  The hospital defendants have not disputed Plaintiff's assertion.  All agree that Bronson Healthcare, a private organization, later purchased South Haven Health System, of which the hospital was a part.  The Court still has questions about who owned the hospital at the time the events occurred and is not making a finding on state action.  Ultimately, it does not matter whether the hospital defendants acted under color of law, because the Court finds that even if they were state actors, they are entitled to qualified immunity.

It is undisputed that T.R. presented at the hospital in the protective custody of Officer Olney.  The unrebutted record reflects that Officer Olney informed Nurse Parker that she had spoken with T.R.'s parent, but that she did not inform Nurse Parker that T.R.'s father had refused consent for treatment.  Under these circumstances, it was reasonable for Nurse Parker and

---

[8] A state hospital such as a university medical center is a government actor subject to suit under § 1983.  *Ferguson v. City of Charleston*, 532 U.S. 67, 76 (2001).

Defendant Orrico to provide medical treatment to T.R.   While warrantless, non-consensual laboratory testing as part of a criminal investigation may impinge constitutional rights, *Ferguson v. City of Charleston*, 532 U.S. 67 (2001), there was no criminal investigation here.  Nurse Parker and Defendant Orrico were simply providing ordinary medical care to a minor at the behest of Officer Olney, who appeared to have authority to consent to the care.  Plaintiff has identified, and the Court has found, no case that would put Nurse Parker and Defendant Orrico on notice that providing medical care to a minor in protective custody of a police officer, outside of any criminal investigation, might violate clearly established rights.

### CONCLUSION

For these reasons, Defendant Olney's motion for summary judgment (ECF No. 95) is **GRANTED** to the extent already addressed in the Court's previous order (ECF No. 113) and **DENIED** in all other respects.  Plaintiff's claims premised on Defendant Olney's decision to take T.R. to the hospital for medical treatment despite her wishes and Mr. Machan's express direction shall proceed to trial.

Defendants South Haven Health Systems, Jennifer Parker, and Weston Orrico's motion for summary judgment (ECF No. 91) is **GRANTED** to the extent not already decided by the Court's previous Order (ECF No. 113).

Dated:      June 1, 2018                              /s/ Robert J. Jonker
                                                     ROBERT J. JONKER
                                                     CHIEF UNITED STATES DISTRICT JUDGE